**[Cite as *Johnson v. Clark Cty. Bd. of Revision*, 2014-Ohio-329.]**

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

| | | |
|---|---|---|
| WILLIAM S. JOHNSON | : | |
| Plaintiff-Appellant | : | C.A. CASE NO. 2013 CA 32 |
| v. | : | T.C. NO. 2011-Y-1699 |
| CLARK COUNTY BOARD OF REVISION, et al. | : | (Administrative Board of Tax Appeals) |
| Defendants-Appellees | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____31st_____ day of _____January_____, 2014.

. . . . . . . . . .

WILLIAM S. JOHNSON, P. O. Box 62, Clifton, Ohio 45316
     Plaintiff-Appellant

WILLIAM D. HOFFMAN, Atty. Reg. No. 0047109, Assistant Prosecuting Attorney, 50 E. Columbia Street, 4th Floor, P. O. Box 1608, Springfield, Ohio 45501
     Attorney for Defendant-Appellee Clark County Board of Revision

ROBERT M. MORROW, Atty. Reg. No. 0012367, 1650 Lake Shore Drive, Suite 285, Columbus, Ohio 43204
     Attorney for Defendant-Appellee Greenon Local School District Board of Education

. . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the pro se Notice of Appeal of William S. Johnson, filed March 26, 2013. Johnson appeals from the February 27, 2013 Decision and Order of the Ohio Board of Tax Appeals ("BTA") on Johnson's appeal from the Clark County Board of Revision ("BOR"). The BOR determined the taxable value of Johnson's property, located at 4576 Clifton Road, for tax year 2010.

{¶ 2} On March 31, 2011, Johnson filed a Complaint Against the Valuation of Real Property, seeking a decrease, in the amount of $22,088.00, in the taxable value of his 154.61 acre property. On April 22, 2011, the Greenon Local School District Board of Education filed a Complaint in support of the Auditor's determination of value. The BOR held a hearing on June 2, 2011, attended by Stephen Metzger, Treasurer/Chairman; John Federer, Auditor; Nikki Crawford, of the Auditor's Office; John Detrick, County Commissioner; Roberty Morrow, attorney for the school board, and Johnson. At the start of the hearing, Metzger noted that the "county's current value is $513,330. Taken into consideration CAUV[1] value, it makes the value of 296,900." (sic).

{¶ 3} Johnson testified that his "complaint is broken into three different parts: CAUV, then the valuation on what's listed on the Auditor's report as AP1 and then AP3," and the Auditor's homesite valuation. Johnson testified as follows:

> So we'll start on the CAUV. This is a spreadsheet of the Auditor's CAUV

---

[1] Current Agricultural Use Value. "By a 1973 amendment to the state Constitution, Ohio voters authorized the General Assembly to depart from uniformity in valuing real property by permitting farms to be valued in accordance with their current agricultural use rather than their market value. * * *. 'Under the authorizing amendment and the implementing statutes, "the auditor disregards the highest and best use of the property and values the property according to its current agricultural use," a procedure that "usually results in a lower valuation and a lower real property tax."'" *Maralgate, LLC v. Green Cty. Bd. of Revision,* 130 Ohio St.3d 316, 2011-Ohio-5448, 958 N.E.2d 153, ¶ 13.

and my CAUV based upon the state statutes and the Ohio Department of Taxation, the Division of Tax Equalization tables and then actually going to the Soil and Water Conservation sheet to come up with the actual acreages and the soil types.

The big difference here is the fact that all of the Division of Tax Equalization tables are based on crop land, where, where somewhat poorly drained, poorly drained or very poorly drained soil is tile[d], and they allow a $500 - - $500 for tile drainage.

My particular farm is not tiled. It is, it is a continuing problem, but since the tables that were used to generate the Clark County Auditor's spreadsheet assumed they were tiled, that results in a major part of this discrepancy. The rest of the discrepancies are only minor discrepancies on small differences in acreage and such as that.

{¶ 4} The following exchange occurred at the hearing:

MR. DETRICK: You're emphasizing the tiling because it's made your property value more.

MR. JOHNSON: Right. In other words, they're assuming that - -and I'll give you this - - somewhat poorly drained, poorly drained, or very poorly drained are tiled. And when you go into their big, long worksheet and spreadsheet, that's what it says. And in my particular case, mine are not tiled.

* * * But they assume that these, these bottom dark grounds have a hundred percent yield credit.

Okay? And that's how they base it. They're assuming they're tiled, and they do a very very good job. And they assume these high grounds are like 78 percent yield.

Well, like last year my high grounds * * * were yielding over 200 bushel an acre, and my low grounds were yielding 160. So in other words, for my actual farm, my yields are inverted from the yield that they have listed. And that's all based upon the fact that these are not tiled.

Now, I got an estimate of 80 to 90,000 to tile my place. And to be perfectly honest that's all cash money up front, hard to finance, hard to kind of justify that kind of expense.

MR. FEDERER: Is this whole request based on CAUV?

MR. JOHNSON: No. The most - - 90 percent of it is CAUV. Like I said, there's some small ones on a couple of outbuildings.

MR. FEDERER: Because most of this then would really come from the Ohio Department of Agriculture, not us.

* * *

MR. FEDERER: Maybe we can work with the Department of Agriculture to make sure that the data is right, but we can't affect the value of that farm land, CAUV, from a taxation standpoint.

MR. MORROW: Who makes the [de]termination as to whether this fits the category of what you were reading from? Is that the Auditor?

MR. FEDERER: Department of Agriculture.

MR. JOHNSON: I wouldn't really know, but I assume that the Ohio Department of Taxation put out this particular bulletin which is on your web site, which says that this is used for calculation of values for properties that are being reevaluated for tax year 2010. This is supposed to be the guide, and then there's a whole other table which has all the soil types in it. * * *

MR. FEDERER: So every county - - and again, I'm learning this, too, okay? But for CAUV in 88 counties, the auditor has nothing to do with it for the valuation. All of those factors - -

MR. JOHNSON: A lot of this is nothing but a spreadsheet manipulation. * * *

MR. FEDERER: We don't do that. That all comes from the State of Ohio so . . .

MR. JOHNSON: No. The acreages and soil types don't come from the State of Ohio. * * *

MR. FEDERER: We don't do that. We don't do that. We don't determine soil types.

MR. MORROW: This is all the category of wood land value, poorly drained.

MR. JOHNSON: Right. Because all of the stuff for crop - - crop land assumes that it is tile.

* * *

MR. JOHNSON: I understand the whole situation, you know, but mine is unique. Everybody around me has spent a lot of money to tile their place. I

haven't. It affects my yields.

{¶ 5} In the course of the hearing, Metzger advised Johnson that Crawford "talked to Tina in the Auditor's office, and this issue can be addressed, but it must be addressed with Chris Simpson" at the Soil and Water Conservation. Metzger stated that Simpson, "if there appears to be an adjustment, then he then would notify based upon the tile situation." Crawford clarified that Simpson "would notify Tina at the Auditor's office * * * [a]fter he reviews it."

{¶ 6} Regarding CAUV, in addition to his spreadsheet, Johnson presented a May 7, 2010 "bulletin" from the Ohio Department of Taxation, Division of Tax Equalization, entitled "2010 Current Agricultural Use Value Land Tables." The bulletin provides in part as follows:

EXPLANATION OF THE CALCULATION OF VALUES FOR VARIOUS SOIL MAPPING UNITS FOR TAX YEAR 2010

The annual current agricultural use values of land are calculated by the capitalization of net income from agricultural products assuming typical management, cropping and land use patterns, and yields for given types of soils. The necessary information is available for approximately 3,500 map units, which are the soils with slopes less than 25 percent. The information used for a capitalized net income approach is as follows:

YIELD INFORMATION
CROPPING PATTERNS
CROP PRICES
NON-LAND PRODUCTION COSTS
CAPITALIZATION RATE

A. YIELD INFORMATION

For each of the soil mapping units, data regarding typical yields of each of

the major field crops (corn, soybeans and wheat) were last published in 1984. In order to reflect more accurate yields, those yields of record have been updated annually since 2006. The yields are updated by a factor based on ten years of statewide yield information published by the Ohio Department of Agriculture. For 2010, yield data from calendar years 1999-2008 were averaged and divided by the 1984 yield for each crop. This factor is applied to the 1984 crop yield of record for each soil.

B.  CROPPING PATTERNS

The cropping pattern for each map unit is assigned a rotation based on the most recent five-year average of crop acres harvested in Ohio: 39% corn, 51% beans, and 10% wheat. This rotation is based on data from 2004-2008 and closely reflects current agricultural markets in Ohio. * * *

* * *

F.  CROPLAND VALUES

The current agricultural use cropland value equals the net return for the rotation acre of the soil map unit divided by the capitalization rate. The minimum value for cropland is $200 per acre for soils with 25 percent slope or less.

G.  WOODLAND VALUE

1).  The woodland value, with slopes of 25% or less, equals the cropland value less the costs to convert the woodland to cropland. The conversion costs are as follows:

      a.  Clearing - <u>$500</u> <u>per</u> <u>acre</u> <u>for</u> <u>all</u> <u>soils</u>


      b.  Drainage

          a.)  Excessively drained, well drained, moderately well drained (E, W, MW) - <u>No conversion Costs</u>

          b.)  *Somewhat poorly drained, poorly drained, very poorly drained, saturated (SWP, P, VP) - $500 for Tile Drainage*[2]

\* \* \*

**{¶ 7}**    Thereafter, the following exchange occurred:

MR. FEDERER: If in reality - - and at this particular point I don't know the mechanics here - - it would seem like if, if the Ohio Department of Agriculture is assessing you in CAUV on what their factors are, and they have incorrect data, there's a problem.

If they have correct data on your property, they will assess you on the factors they have on what's accurate.   Okay?   And we don't - - we, no 88 county auditor makes a call on that.

MR. JOHNSON: Well, actually it's kind of interesting because for some of the soil types in there they have tiled and untiled.   Okay?   But they assume - -

MR FEDERER: We don't develop the   - - we don't say - -we in Clark County don't say your soil type is X.   We don't make that call.   We don't do that.

\* \* \*

MR. JOHNSON: But somebody - - somebody had to do that and

---

[2]This section was highlighted by Johnson.

somebody had to make the determination of whether that soil type was tiled or not tiled.

MR. FEDERER: That would be Chris Simpson.

MS. CRAWFORD: When I talked to Tina, she basically said as far as the USDA, if you take that to Chris Simpson, he will review that with you.

* * *

MR. FEDERER: And he's the guy you need to get close to.

MR. JOHNSON: Be happy to do that.

MS. CRAWFORD: Any recommendation that comes out of that will come to the Auditor's office and changes will be made. And she also said as far as the tile versus untiled, he could also help you with that, too. * * * Again, whatever recommendation that he gives back to the Auditor's office is what we would do.

{¶ 8} In addition to CAUV, Johnson disputed the Auditor's "homesite" valuation of $20,000.00 for one acre, asserting that it should be $10,000.00. According to Johnson, the "homesite is 2.5 acres, not one acre." He asserted that the Auditor values the property at $1,898.00 per acre, for a homesite land value of $4,746.00 for two and a half acres, to which he added $3,000.00 for a septic tank, $900.00 for a well, $552.00 for a water pump, $52.00 for propane, and $750.00 for a "hard driveway," to arrive at $10,000.00. Johnson did not dispute the appraised value of his home.

{¶ 9} Johnson also disputed the value of a wood barn on his property, indicated on the Property Record Card as AP1, with a value of $5,430.00. He stated that the dimensions are "34 x 40," and that he does not "understand why the value is set at 5,430. I only paid - - in '95 I paid

7,800 to have it built. It's a wood barn. The clapboard is substantially deteriorated." Johnson stated that the barn has a cement floor, but no electricity or running water. He stated that "it's the only one that didn't go down from 2009. Same value. Everything else went down so I took the same percent that everything had gone down from 2009 to 2010." When asked if he had the barn appraised, Johnson replied, "Well, first of all, I know what I paid for it," and "I know what I can replace it for." Johnson asserted that the barn is worth $4,800.00, an amount he described as "high based upon the condition of it."

{¶ 10} Finally, Johnson disputed the value of a three-sided building on his property that has a dirt floor. The building is indicated on the Property Record Card as AP3, with a value of $17,860.00. Johnson stated that he can replace "it with a brand new one for 12,960." Johnson stated that AP3 has only "got three sides, and it only has one entry door, just a regular three foot entry door."

{¶ 11} The following exchange occurred at the end of the hearing:

MR. FEDERER: In summary, let's make sure we're all together.

* * *

MR. FEDERER: We're going to - - you're going to call Chris Simpson with Water and Soil?

MR. JOHNSON: Right.

MR. FEDERER: He's going to come out, and he's going to review what you have and what we have.

MR. JOHNSON: Okay.

MR FEDERER: And then he's going to get with our office and Tina's

office, and we'll correct any issues we have, right or wrong. I mean, if they're right, they stay. If they're wrong, we'll change it.

And then there needs to be some contact with the Department of Agriculture on the CAUV, and we're going to look at these buildings.

CHAIRMAN METZGER: I think your office will have to look at the buildings.

MR. FEDERER. Right.

MR. JOHNSON: Well, there's still the homesite issue on the 10,000 versus the 20,000 on the homesite.

CHAIRMAN METZGER: And then I think probably Mr. Johnson will probably have to make arrangements to go and see Chris because the soil maps and everything are probably there.

MR. JOHNSON: They're all on the computer anymore.

CHAIRMAN METZGER: I doubt if he'll bring that out to you, your house.

MR. JOHNSON: I've pulled them up on the computer myself.

CHAIRMAN METZGER: Okay.

MR. JOHNSON: All that stuff - - everything is on that net anymore.

CHAIRMAN METZGER: Yeah. Okay. With that, we'll conclude the hearing and thank you very much.

{¶ 12} On June 15, 2011, the BOR issued correspondence to Johnson that provides, "[n]o change in the value of your real property has been made" and indicates current and

recommended values of $513,330.00.

{¶ 13}    On July 9, 2012, Johnson filed a "Motion for Summary Judgment" in the Board of Tax Appeals.  On July 14, 2011, Johnson filed a "Notice of Appeal From A Decision of a County Board of Revision to the Board of Tax Appeals."

{¶ 14}   A hearing before the BTA was held on July 17, 2012.   At the start of the hearing the BTA ruled that it "does not have the power to grant Summary Judgment."   Johnson then testified that there are two "radically different aspects."   Johnson asserted that the entirety of his real property is subject to CAUV valuation.

{¶ 15}   Johnson testified as follows:

THE WITNESS: * * * the County soil and water conservation people do the assessment of soil types based upon - -categorize it based upon crop[,] pasture, woodland, pond and waste.

The County's assessment was inconsistent with the actual use of the land, and it's inconsistent with the USDA confirmed and verified cropland and pasture on the property.

I used the exact same soil and water tool that the soil and water conservation gentleman did to come up with a new spreadsheet of the actual soil values and acreages based upon the actual use of the property.

The major difference between the County Auditor's cropland of 111.5 acres and the confirmed and verified of 108.6 was the fact that the Auditor used hedgerows and all-weather road as cropland.

Johnson testified that the Auditor's valuation was contrary to Ohio Adm. Code 5703-25-34(F).

According to Johnson, "In the case of hedgerows, they would have to be cleared, leveled before you could plow them. And in the case of the all-weather road you would have to remove 12 inches of gravel, fill it in with topsoil before you can plow."

{¶ 16} Johnson further stated that the "major part of the CAUV has to do with the fact that for most of the soil types - - for a good part of the soil types on this particular farm they're classified as requiring drainage to be croplands." According to Johnson, the Auditor has "a crop production index for drained soil, and this is undrained soil. My farm is undrained. The farmers around me have spent over $1,000 an acre on rented land to put tiles in to drain this exact soil type."

{¶ 17} Regarding the home site valuation, the following exchange occurred:

THE WITNESS: Well, we had an issue also on the CAUV, the home site. The CAUV - - The rule * * * under 5703-25-34(I), the County Auditor is to use one acre - -shall be designated a home site if there's a residence on the property.

We took exception with the value of $20,000, and we put together a - - the land value based upon two-and-a-half times the assessed fair market value of the land, plus the cost of putting in all of the utilities, septic, well, propane electricity, and a hard driveway to come up with our home site value. The Auditor had no values for one-acre home sites when we asked them.

THE EXAMINER: * * * What is your opinion that the home site - - So you're questioning the land of the home site?

THE WITNESS: Under the CAUV they allocate one acre of the farm for a home site. The County Auditor assessed that as $20,000. * * * I have used a

two-and-a-half factor value on the Auditor's fair market value for the land.

THE EXAMINER: And how did you come up with that?

THE WITNESS: First of all, I took the Auditor's fair market value for the land. I assume when you buy a one-acre lot you have to pay a premium. I figured that at 250 percent. And then I added in the cost of providing utilities, basic utility service, at that spot.

This was mainly because you have got quarter acre lots which are worth, in Springfield, basically nothing, a dollar. You have five-acre lots that are selling for 26,000. You can't buy a one-acre lot. It's not buildable. So there is not, quote, fair market value for a one-acre since you can't buy a one-acre rural lot and build on it per code.

{¶ 18} Regarding his farm buildings, the following exchange occurred:

THE WITNESS: On two of the buildings - - one of the buildings was listed as a pole building, a four-sided pole building that was fully enclosed. The actual building is a three-sided pole building that is open and has a dirt floor.

I have tried for several years to get them to change that. They didn't change that. I put together as Exhibit 2, the fact that I could buy brand new a building of that size for the value that I claim in my appeal.

So, obviously, if I could buy a brand new building for that value and they're not properly categorizing the size and configuration of the building, then mine is a better assessment of the value of that building.

The other building had to do with the capitalization rate on one of the other

buildings that they had - - And I still don't understand - -and they couldn't explain it either - - their capitalization rate.

\* \* \*

THE EXAMINER: What are you looking at?

THE WITNESS: This is the data card off the County Auditor's online site.

THE EXAMINER: For your property?

THE WITNESS: For my property. And it shows the depreciation rate somewhere between nine and ten percent, yet they never depreciated an old wood building. And I was - - I said, "Well this is an old wood building. The siding is falling apart on it. Why aren't you using the depreciation rate you have in your own spreadsheet?" And you can - -Their answer was no chance.

{¶ 19} Johnson produced correspondence, dated September 12, 2011, from the Auditor's Office, that provides in part, "\* \* \* It has come to our attention that there were some discrepancies on the real estate property that our records did not indicate. Over the past few months, the Appraisal Department has made site visits to the property to verify our data on file." Johnson asserted that "they reduced my total fair market value for 2011. So I assume they addressed the exact issues in my 2010 appeal, but they didn't do it for 2010." Johnson stated that he has not had his property or the improvements thereto appraised within the last five years. When asked about the fair market value of his property, Johnson replied, "I am interested only in my taxable value, which is a summation of the CAUV value for land, plus the buildings on the land. That's all that's at issue with me. I am going to farm the land forever. It's going to stay in my family, so I am not worried about a recoupment on fair market value for the land."

{¶ 20} In addition to the correspondence above, the following exhibits were admitted: a spreadsheet prepared by Johnson demonstrating the Auditor's current property values and values determined by Johnson, and delineating soil type, acreage and cost per acre; advertisements for pole buildings reflecting their costs; an aerial Web Soil Survey/ Soil Map of his and neighboring property, and information from the Auditor's website regarding the appraised values of the farm buildings on Johnson's property.

{¶ 21} In its Decision and Order, the BTA noted that Johnson's property is comprised of 154.61 acres, and that the "true value as determined by the auditor for tax year 2010 is $513,330, though the majority of acreage benefits from current agricultural use value." The BTA noted that Johnson sought "a reduction in value to $233,807." The BTA noted that it was Johnson's burden to provide evidence that he is entitled to a reduction in value, and that if he does so, "other parties asserting a different value then have a corresponding burden of providing sufficient evidence to rebut the appellant's evidence."

{¶ 22} The BTA's decision provides:

Mr. Johnson primarily argues that the auditor had not assessed the subject property in conformance [with] R.C. 5713.30 based on the actual quantity of soil types present in the subject property. When land is devoted exclusively to agricultural use, the property owner may apply for CAUV status to avoid real property tax assessment based on the true value as appraised by the auditor. The value assessed is based on the land tables prescribed by the tax commissioner pursuant to Ohio Adm. Code 5703-25-33, which are calculated "by the capitalization of the typical net income before real property and income taxes from

agricultural products assuming typical management, cropping and land use patterns and yields for a given type of soil, as provided in this rule." The process in which the CAUV land tables are used to appraise the land is set forth by Ohio Admin. Code 5703-25-34.

**{¶ 23}** After describing the appraisal process, the BTA concluded that Johnson "did not provide sufficient support or explanation for the values contained" in his spreadsheet and aerial map, and it concluded that the "map and spreadsheet do not provide adequate support to change the CAUV determination for tax year 2010."

**{¶ 24}** Regarding Johnson's assertion that the Auditor overvalued the homesite and farm buildings, the BTA noted that "[t]ypically, the 'best evidence' of a property's value is the amount for which it transfers between two unrelated parties near tax lien date," and it further noted that an appraisal is usually necessary. After noting that the property had not been recently sold or appraised, and that Johnson "relied on his testimony, using the agricultural values as set by CAUV as the starting point for his true value calculation," the BTA found Johnson's evidence "to be deficient and Mr. Johnson's opinion of the subject's value for tax year 2010 unsupported," reasoning as follows:

> In an apparent attempt to apply the cost approach to value, Mr. Johnson provided his opinion of the homesite, by valuing it at the pasture rate, adding the amounts that he feels are appropriate for the septic tank and field, well, water pump installation, propane installation, electric service, and the driveway. * * * Mr. Johnson did not dispute the value appraised to the residence but did submit advertisements for replacement costs of outbuildings, apparently making

adjustments based on how they vary from the existing outbuildings. * * * With respect to the outbuildings, the appellant submitted advertisements for new outbuildings, attempting to make adjustments based on the characteristics of those located on the subject property.

{¶ 25} The BTA acknowledged that in Ohio an owner of real or personal property is competent to testify as to its market value, but that the factfinder is free to disregard an owner's opinion of value. The BTA noted that Johnson "is not an appraiser by trade, yet the opinions that he expressed were in the nature of an expert's opinion. We find nothing in the record to demonstrate appellant's knowledge regarding real estate valuation or to qualify him as an expert." The BTA noted that "while Mr. Johnson may be competent to offer an opinion as to the value of his own property, his testimony must also be probative and credible."

{¶ 26} The BTA concluded as follows:

Mr. Johnson's opinion, however, is not sufficient to support the requested change. The cost approach analysis involves a more thorough analysis that should be done by an appraiser, such as whether the replacement or reproduction cost is appropriate, estimation of both direct and indirect costs of the improvements, and an estimation of the depreciation of the structure. * * * As the party challenging the auditor's values, Mr. Johnson

must provide competent and probative evidence of the value sought. We must conclude that the appellant's assertions are not a sufficient basis to support the requested change, as he did not provide any credible evidence as support for the values claimed.

Accordingly, based upon the foregoing, this board finds that the appellant has failed to demonstrate that the value sought has a basis in the market, as of the tax lien date in question. * * * It is therefore the order of this board that the subject property's true and taxable values, as of January 1, 2010 were as follows:

|  | TRUE VALUE | TAXABLE VALUE |
|---|---|---|
| LAND | $362,630 | $51,170 |
| BUILDING | $150,700 | $52,750 |
| TOTAL | $513,330 | $103,920 |

**{¶ 27}** In a footnote the BTA noted that Johnson provided the auditor's appraised value for tax year 2011, and asserted that the "Ohio Supreme Court, however, has rejected the argument that a property's valuation from one tax year is competent and probative evidence of value for another tax year." In another footnote, the BTA indicated that the above values "are based on the values listed on the property record card provided by the BOR in the transcript. It appears that the taxable values assessed by the auditor are based on the current agricultural use value of the land in accordance with R.C. 5713.31 and the common level of assessment adopted by the tax commission pursuant to R.C. 5715.01."

**{¶ 28}** Johnson asserts seven assignments of error herein. We will consider his first four assignments of error together, as they each relate to the issue of CAUV. They are as follows:

THE [BOR] REFUSED TO RENDER A DECISION ON THE APPELLANT'S TIMELY FILED COMPLAINT OF VALUATION ON THE "CURRENT AGRICULTURAL USE VALUE" * * * OF HIS FARMLAND AS

REQUIRED BY ORC 5715.19 AND OAC 5703-25-34. THE APPELLANT MOVED THAT THE OHIO BOARD OF TAX APPEAL * * * GRANT APPELLANT'S CAUV VALUE OF HIS FARMLAND SINCE BOR REFUSED TO RENDER A DECISION ON THE CAUV. THE BTA REFUSED TO RULE ON THE APPELLANT'S MOTION OR REMAND THIS ISSUE TO THE BOR TO RENDER A DECISION AS REQUIRED BY LAW.

And,

THE BOR ERRED WHEN IT FAILED TO CONTACT THE TAX COMMISSIONER TO SECURE THE PER ACRE UNIT VALUE FOR THE SOIL TYPE THAT THE APPELLANT CLAIMS ARE NOT INCLUDED IN THE "CURRENT AGRICULTURAL USE VALUE OF LAND TABLES" AS REQUIRED BY OAC 5703-25-34(E). THE BTA ERRED WHEN THEY DID NOT LIKEWISE CONTACT THE TAX COMMISSIONER TO SECURE THE PER ACRE UNIT VALUE FOR THE SOIL TYPE IN QUESTION.

And,

THE BTA ERRED WHEN IT RULED THAT THE AUDITOR'S ACTIONS IN CALCULATION [OF] THE CAUV LAND VALUES ARE PRESUMED TO BE VALID * * *. THE AUDITOR DID NOT ACT WITHIN THE LIMITS OF THE JURISDICTION CONFERRED BY LAW. ADDITIONALLY, THERE IS ABUNDANT PROOF WITHIN THE BOR TRANSCRIPT THAT THE AUDITOR WAS COMPLETELY UNAWARE OF THE PROCEDURES, REQUIREMENT, AND DUTIES REQUIRED OF HIM IN

THE CAUV VALUATION PROCESS * * *.

And,

THE BTA ERRED WHEN IT RULED THAT THE AUDITOR'S ACTIONS IN CALCULATION [OF] THE CAUV CROPLAND, WOODLAND, PASTURE, AND WASTE ACREAGES ARE PRESUMED TO BE VALID * * *. THIS IS CONTRARY TO THE EVIDENCE PRESENTED AND CONTRARY TO INDEPENDENT THIRD PARTY VERIFICATION AND CERTIFICATION BY THE USDA THRU THE FARM SERVICE AGENCY.

{¶ 29} We initially note that R.C. 5715.19(A)(1)(e) and (f) provide that "[a]ny person owning taxable real property in the county" may file a complaint with the county auditor regarding the "determination of the total valuation of any parcel that appears on the agricultural land tax list."[3] "The county auditor shall present to the county board of revision all complaints filed with the auditor." R.C. 5715.19(f). Upon the filing of such a complaint, "the board of education * * * shall be made a party to the action." R.C. 5715.19(B). "The board of revision shall hear and render its decision on a complaint within ninety days after the filing thereof with the board, except that if a complaint is filed within thirty days after receiving notice from the auditor as provided in division (B) of this section, the board shall hear and render its decision within ninety days after such filing." R.C. 5715.19(C).

{¶ 30} R.C. 5715.19(G) provides as follows:

A complainant shall provide to the board of revision all information or evidence within the complainant's knowledge or possession that affects the real

_____

[3]See R.C. 5713.33

property that is the subject of the complaint. A complainant who fails to provide such information or evidence is precluded from introducing it on appeal to the board of tax appeals or the court of common pleas, except that the board of tax appeals or court may admit and consider the evidence if the complainant shows good cause for the complainant's failure to provide the information or evidence to the board of revision.

{¶ 31} Section 36, Article II of the Ohio Constitution provides that "laws may be passed to provide that land devoted exclusively to agricultural use be valued for real property tax purposes at the current value such land has for such agricultural use." R.C. 5713.30(A) sets forth when land is "devoted exclusively to agricultural use" based upon acreage.

{¶ 32} R.C. 5713.30 provides as follows:

As used in sections 5713.31 to 5713.37 and 5715.01 of the Revised Code:

(A) "Land devoted exclusively to agricultural use" means:

(1) Tracts, lots, or parcels of land totaling not less than ten acres that, during the three calendar years prior to the year in which application is filed under section 5713.31 of the Revised Code, and through the last day of May of such year, were devoted exclusively to * * * the production for a commercial purpose of * * * field crops, * * * or the growth of timber for a noncommercial purpose, if the land on which the timber is grown is contiguous to or part of a parcel of land under common ownership that is otherwise devoted exclusively to agricultural use,* * *;

{¶ 33} R.C. 5715.01 provides:

(A) The tax commissioner shall direct and supervise the assessment for

taxation of all real property. The commissioner shall adopt, prescribe, and promulgate rules * * * for the determination of the current agricultural use value of land devoted exclusively to agriculatural use. The uniform rules shall prescribe * * * the method for determining the current agricultural use value of land devoted exclusively to agriculatural use, which method shall take into consideration: the productivity of the soil under normal management practices; the average price patterns of the crops and products produced to determine the income potential to be capitalized; the market value of the land for agricultural use; and other pertinent factors. The rules shall provide that in determining the true value of lands or improvements thereon for tax purposes, all facts and circumstances relating to the value of the property, its availability for the purposes for which it is constructed or being used, its obsolete character, if any, the income capacity of the property, if any, and any other factor that tends to prove its true value shall be used. * * *

(B) The taxable value shall be that percent of true value in money, or current agricultural use value in the case of land valued in accordance with section 5713.31 of the Revised Code, the commissioner by rule establishes, but it shall not exceed thirty-five percent. The uniform rules shall also prescribe methods of making the appraisals set forth in section 5713.03 of the Revised Code. * * * County auditors shall, under the direction and supervision of the commission, be the chief assessing officer of their respective counties, and shall list and value the real property within their respective counties for taxation in accordance with this

section and sections 5713.03 and 5713.31 of the Revised code and with such rules of the commissioner. * * *

{¶ 34} Ohio Adm Code 5703-25-36(A) provides: "Rules 5703-25-30 to 5703-25-36 of the Administrative Code shall be applied in valuing and assessing land that has qualified to be valued at the current value such land has for agricultural use under the provisions of sections 5713.30 to 5713.38 of the Revised Code * * * ." Ohio Adm. Code 5703-25-30(B)(2) provides the following "[n]onstatutory" definition of the current agricultural use value of land:

The current agricalatural use value of land devoted exclusively to agricultural use of a parcel is the current market value or fair market value of the land considering only those factors that affect the parcel's value from an agricultural standpoint. It is the price at which the property would change hands on the open market between a willing buyer and seller, neither being under any compulsion to buy or sell, and both having knowledge of all relevant facts, if the highest and best use was exclusively agricultural with no other influence being present. Usually this value will be highly dependent on the soil productivity of the parcel.

{¶ 35} Ohio Adm. Code 5703-25-31 provides in part as follows:

(C) The current agricultural use value of land can be estimated by the capitalization of the typical net income from agricultural crops on a given parcel of land assuming typical management, cropping patterns, and yields for the type of soil present on the tract. Values estimated by this method will closely approximate actual market values of farm land where the actual highest and best

use is exclusively agricultural unaffected by other uses.

{¶ 36}  Pursuant to Ohio Adm Code 5713.31, and upon application of an owner of agricultural land seeking current agricultural use valuation, if "the auditor determines * * * that the land is land devoted exclusively to agricultural use he shall appraise it for real property tax purposes in accordance with the rules adopted by the commission for the valuation of land devoted exclusively to agricultural use * * *."  R.C. 5713.31 further provides: "The auditor shall enter on the real property record required under section 5713.03 of the Revised Code for the tract, lot or parcel of land so appraised, in addition to the other information required to be recorded thereon, its value as land devoted exclusively to agricultural use."

{¶ 37}  Ohio Adm. Code 5703-25-33 sets forth the Current Agricultural Use Value of Land Table or Tables created by the tax commissioner to value the current agricultural use value of land.  Section (E) of Ohio Adm. Code 5703-25-33 provides that in "the absence of crop yield information for any soil mapping unit[4] present in Ohio, the tax commissioner shall, in consultation with the department of natural resources of Ohio, determine the appropriate crop yield and soil productivity information for that mapping unit." Ohio Adm. Code 5703-25-34 governs the use of the tables by the auditor.  As quoted by the BTA, Ohio Adm. Code 5703-25-34 provides in relevant part as follows:

---

[4]"Areas of a soil type or types delineated on a soil map."  Ohio Adm. Code 5703-25-30(B)(20).

(B) The first step in the appraisal of land used exclusively for agricultural use is to determine from county soil survey maps, soil maps of individual farms prepared by the division of land and soil of the department of natural resources of Ohio and/or the conservation service, U.S.D.A., or other sources of information the different soil types[5], land capability classes[6] and land uses together with the acreage in each category for the tract or parcel. Where detailed soil surveys are not available the county auditor shall consult with the soil conservation service and other knowledgeable sources on the most practical way to utilize the prescribed tables.

(C) Soil scientists, in preparing a detailed soil survey or individual soil conservation maps indicate different soil categories by "mapping units" shown on the map by the "map symbol"[7] with the area included in this unit outlined. * * *

---

[5]"A soil which throughout its full extent has relative uniform texture." Ohio Adm.Code 5703-25-30(B)(24).

[6]"A system of classifying land according to physical limitations arising from slope, drainage and erosion characteristics of the soil used by the U.S.D.A. soil conservation service. The classes are designated by Roman numerals I through VIII with progressive greater limitations and narrower choices for practical use as the number increases. Classes I through IV are suitable for general field crops. Classes V through VIII are limited to pasture, forest land or wildlife." Ohio Adm. Code. 5703-25-30(B)(8).

[7]"Letter or numerical symbol used to identify a soil mapping unit on a soil map."

(D) After delineation of the boundaries of the farm or tract on the soil map the acreage in each soil type and land capability class can be measured with a grid or planimeter. * * * When each soil type and land capability class has been identified and the acreage determined the information is to be listed on the property record card. It should be noted that once this information is initially recorded and verified that a permanent inventory of soil information will have been established for a parcel, with very few exceptions, unless the property boundaries are changed.

(E) If a particular soil type is not included in the "current agricultural use value of land table or tables" prescribed by the tax commissioner for the given year, in said county as described in rule 5703-25-33 of the Administrative Code, then the county auditor shall contact the county commissioner to secure the per acre unit value for the soil type. The tax commissioner shall then compute a use value as prescribed in rule 5703-25-33 of the Administrative Code for that soil type.

(F) Since land capability classes I through IV are suitable for general field crops the cropland price shall be used for soil areas in these classes unless an investment in capital such as clearing or drainage is needed to convert the land from its present use such as woods to tillable cropland. If by simply plowing, etc. the land can be converted no adjustment is needed. Where such adjustment is needed it shall be made by using the per acre value of cropland for the next highest numbered land capability class for the specific mapping unit until the land is converted to cropland use. Woodland prices for classes I through IV in the

prescribing tables allow for clearing and drainage in classes I and II and clearing in classes III and IV.   Land capability classes V through VIII are priced as pasture or woodland according to prescribed tables.

In the classification of the various soil types into soil management groups[8] and the calculation of minimum yields under good management the hazards of the various soil types such as drainage, erosion, shallow, droughty or stony solid has been recognized and accounted for.

        * * *

(K) The agricultural use land value shall be the total of values extended by application of unit values from the Current Agricultural Land Use Tables and the value of the homesites.   The "total agricultural use land value" is entered on the real property record required by section 5713.03 of the Revised Code, together with the "true value" of the land as determined in accordance with Section 2, Article XIII of the Ohio Constitution.   Any differences in value shall be noted on the real property record.

{¶ 38}   Finally, Ohio Adm. Code 5703-25-35 provides:

In counties that have completed a sexennial reappraisal of real property for taxable purposes in 1972 or later the agricultural use land taxable value shall be the same percentage of agricultural use land value as that prescribed by rule 5703-25-06 of the Administrative Code, or any future revision of such rule,

---

[8]"A group of soils with similar properties and crop yields." Ohio Admin. Code 5703-25-30(B)(18).

currently thirty-five per cent, to determine taxable value of all other taxable real property. The total taxable value of the parcel shall be calculated by adding the current agricultural use land taxable value to the taxable value of the improvements determined as required by rule 5703-25-06 of the Administrative Code.

{¶ 39}  R.C. 5717.01 permits parties to appeal the decision of the BOR to the BTA, and as noted by the Supreme Court of Ohio:

R.C. 5717.04 sets forth the appropriate standard of review for matters on appeal from the Board of Tax Appeals: "If upon hearing and consideration of [the] record and evidence the court decides that the decision of the board appealed from is reasonable and lawful it shall affirm the same * * *." In *Howard v. Cuyahoga Cty. Bd. of Revision* (1988), 37 Ohio St.3d 195, 197, 524 N.E.2d 887, we reiterated that the standard of review for a matter appealed from the BTA is whether the decision "is reasonable and lawful." Further, we acknowledged in *Ameritech Publishing, Inc. v. Wilkins*, 111 Ohio St.3d 114, 2006-Ohio-5337, 855 N.E.2d 440, that "'[t]he BTA is responsible for determining factual issues and, if the record contains reliable and probative support for these BTA determinations,' this court will affirm them." Id. at ¶ 5, quoting *Am. Natl. Can Co. v. Tracy* (1995), 72 Ohio St.3d 150, 152, 648 N.E.2d 483. *Girl Scouts-Great Trail Council v. Levin,* 113 Ohio St. 3d 24, 25, 2007-Ohio-972, 862 N.E.2d 493, 495, ¶ 9.

{¶ 40}  We initially note that contrary to Johnson's assertions, the BOR issued a decision on his complaint in that it decided to maintain the Auditor's valuation. Further, the

BTA did not refuse to rule on Johnson's motion for summary judgment but rather correctly found that it did not have the power to grant summary judgment in the context of Johnson's appeal from the BOR.

{¶ 41} After a thorough review of the record, however, it is unclear how the Auditor and the BOR arrived at the CAUV value of Johnson's property. In other words, there is no reliable and probative support in the record for the value at which they arrived. As Johnson asserts, at the hearing before the BOR, the Auditor admitted that he was unfamiliar with the "mechanics" of the calculation of CAUV, as set forth above at length, and he referred Johnson to Chris Simpson to determine Simpson's recommendation for the Auditor's calculation. Nothing in the record suggests that the Auditor in fact received a recommendation or otherwise evaluated Johnson's CAUV. In affirming the decision of the BOR, the BTA merely recited a portion of the applicable law and then deferred to the Auditor's valuation, noting in a footnote that "it *appears* that the taxable values assessed by the auditor are based on the current agricultural use value of the land * * * and the common level of assessment adopted by the tax commission * * *." (Emphasis added). We note that the property record card upon which the BTA relies does not expressly delineate the value of Johnson's property "as land devoted exclusively to agricultural use," as required by R.C. 5713.31 and Ohio Adm. Code 5703-25-34(K). For the foregoing reasons, the matter is remanded to the BOR to demonstrate how it arrived at the CAUV for Johnson's property and if warranted, adjust the CAUV accordingly[9].

{¶ 42} Johnson's remaining assignments of error are related to the buildings and the

---

[9]As noted above, Johnson was assured a site visit and evaluation by Chris Simpson regarding the 2010 CAUV valuation at the hearing before the BOR.

value of the homesite on his property, and we will consider them together.   They are as follows:

THE BOR AND BTA ERRED WHEN THEY RULED THAT THE APPELLANT'S OPINION WAS NOT SUFFICIENT TO SUPPORT THE REQUESTED CHANGE IN VALUE OF:

A[.] 34X40 BARN BUILT IN 1996 LISTED IN THE AUDITOR'S RECORDS AS AP1 (HEREAFTER REFERRED TO AS AP1).   THE AUDITOR DESCRIBES THE BARN AS A FOUR SIDED CLOSED METAL POLE BUILDING.   THIS BUILDING IS IN FACT SIDED WITH COMPRESSED FIBERWOOD, WHICH HAS SUBSTANTIALLY DETERIORATED.

B.   40X54 METAL POLE BUILDING BUILT IN 2001 LISTED IN THE AUDITOR'S RECORDS AS AP3 (HEREAFTER REFERRED TO AS AP3). THE AUDITOR DESCRIBES THE BUILDING AS A FOUR SIDE CLOSED METAL POLE BUILDING, WHEN IN FACT IT IS A THREE SIDE OPEN SHED.

And,

IN REFERENCE TO AP3, THE BTA ERRED WHEN IT RULED, "THE COST APPROACH INVOLVES A MORE THOROUGH ANALYSIS THAT SHOULD BE [D]ONE BY AN APPRAISER."   "MR. JOHNSON'S OPINION IS NOT SUFFICIENT TO SUPPORT THE REQUESTED CHANGE." * * *

And,

THE BTA ERRED WHEN IT RULED THAT THE APPELLANT "DID NOT PROVIDE CREDIBLE EVIDENCE AS SUPPORT FOR THE VALUES CLAIMED" ON THE HOME SITE.

**{¶ 43}** As the Supreme Court of Ohio determined:

The administrative rules prescribe the methods for valuing land and improvements. Ohio Admin.Code 5703-25-12 states that when valuing improvements, the auditors may use the market-data, the income, or the cost approach.

The cost method of valuing improvements seeks to determine what a potential buyer would expect to pay in constructing a replacement for the existing building. That number is significant because "[a] prospective purchaser will not rationally pay $15,000 for a house, or for 100 shares of stock, or for a shipment of wheat if, without serious delay, he can build or buy equally satisfactory substitutes for $10,000." 1 Bonbright, The Valuation of Property (1937) 157. See *Dinner Bell Meats, Inc. v. Cuyahoga Cty. Bd. of Revision* (1984), 12 Ohio St.3d 270, 271, 12 OBR 347, 466 N.E.2d 909, fn. 1. By determining the cost to replace existing improvements, the auditor establishes an upper limit to the amount a buyer would be willing to pay for an existing structure. Id. at 272, 12 OBR 347, 466 N.E.2d 909; *Meijer, Inc. v. Montgomery Cty. Bd. of Revision* (1996), 75 Ohio St.3d 181, 187, 661 N.E.2d 1056. * * * When county auditors compute cost value, Ohio Adm.Code 5703-25-12(A) first requires the estimation of "replacement cost new," after which an appropriate deduction must be made for depreciation and obsolescence. Ohio Adm.Code 5703-25-12(B) also directs the auditors to maintain "schedules of all building costs" for separate categories of residential, commercial, industrial, and farm buildings, which are to be used in estimating

replacement cost. The rule expressly mentions that the schedules shall be based in part on the "type or grade of building in the area to be appraised." *Dayton-Montgomery Cty. Port Auth. v. Montgomery Cty. Bd. of Revision*, 113 Ohio St. 3d 281, 284-85, 2007-Ohio-1948, 865 N.E.2d 22, ¶ 11-12.

**{¶ 44}** Regarding depreciation and obsolescence, Ohio Adm. Code 5703-25-12(D)(2) provides:

Depreciation and obsolescence shall depend upon the following three factors:

(a) Physical depreciation is a loss in value resulting from physical deterioration due to age, wear and tear, disintegration, and the action of the elements. The amount deducted for physical depreciation shall reflect loss in value due to general deterioration and the need for rehabilitation.

(b) Functional obsolescence is a loss in value resulting from poor planning, overcapacity or undercapacity, due to age, size, style, technological improvements or other causes within the property. There are two types of functional obsolescence:

(i) Curable functional obsolescence which may be estimated at the amount it would cost to modernize the improvements.

(ii) Incurable functional obsolescence which may be estimated by considering the amount it would cost to replace the improvements with a modern structure suitable for the same purpose, or by the capitalization of the loss of income due to the degree of in-utility or extraordinary operating costs related to the structure.

(c) Economic obsolescence is a loss due to external economic forces, such as changes in the use of land, location, zoning or legislative enactments that might restrict or change property rights and values and other similar factors.

**{¶ 45}** As noted in *Dayton-Montgomery Cty. Port Auth.,* "when a county auditor acts 'within the limits of the jurisdiction conferred by law,' the auditor's action is 'presumed, in the absence of proof to the contrary, to be valid and to have been done in good faith and in the exercise of sound judgment.'" *Id*., ¶ 13. Further, "'[t]he burden is on the taxpayer to prove his right to a deduction,'" and "'[h]e is not entitled to the deduction claimed merely because no evidence is adduced contra his claim.'" (citation omitted). *Id*., ¶ 15. As the Supreme Court of Ohio further noted:

Because "the burden of persuasion before the BTA was on [the challenger], not the BOR," we have in a proper case held that "[w]here the BTA rejects the evidence presented to it as not being competent and probative, or not credible," and where "there is no evidence from which the BTA can independently determine value," the BTA "may approve the board of revision's valuation, without the board of revision's presenting any evidence." *Simmons v. Cuyahoga Cty. Bd. of Revision* (1998), 81 Ohio St.3d 47, 48, 49, 689 N.E.2d 22. *Id*.

**{¶ 46}** "While an owner may testify as to the value of his or her property, there is no requirement that the finder of fact accept that value as the true value of the property." *WJJK Investments, Inc. v. Licking Cty. Bd. of Revision*, 76 Ohio St.3d 29, 32, 665 N.E.2d 1111 (1996). We note that, contrary to Johnson's assertion, the property record card identifies AP3 as a "1s Op Mtl" building, and his exhibit 7 identifies AP3 as a "one side open metal pole bldg," and not a four-sided building. AP1 is identified on the property record card and exhibit 7 in part as a

metal building, and while Johnson asserted to the BTA that the building is in fact "an old wood building" that was improperly depreciated, the BTA determined that his opinion regarding both buildings is not credible. We cannot conclude that the BTA's decision to revert to the Auditor's valuation was unreasonable or unlawful, since Johnson's opinion is unsupported in the record. *See NTD Properties, LTD. v. Auditor of Clark County*, 2d Dist. Clark No. 2013 CA 13, 2013-Ohio-3652, ¶ 28 (holding, based upon a market analysis of value presented by a professional appraiser, that "sufficient, probative evidence exists in the record that affirmatively contradicts the auditor's determination, and that the trial court's decision to revert to the auditor's determination, in the absence of any evidence to support it, was unreasonable and unlawful.")

{¶ 47} Regarding the homesite valuation, Ohio Adm. Code 5703-25-34 (I) provides:

> (I) One acre for each residence on a parcel shall be valued as a homesite in the same manner as similar homesites in the area on a market value basis. Land shall not be valued on a homesite basis unless there is a building or a house trailer used for human habitation located on such parcel. Improvements including residences, agricultural service and other buildings are valued and assessed as provided in rules 5703-25-05 to 5703-25-17 of the Ohio Administrative Code.

> * * *

{¶ 48} Johnson testified that he "assume[d] when you buy a one-acre lot you have to pay a premium. I figured that at 250 percent. And then I added in the cost of providing utilities * *

* at that spot." His spreadsheet indicates 2.50 acres for the homesite with a value of $4,746.00, plus improvements that total $5,254.00, for a total value of $10,000.00, as opposed to the Auditor's homesite value of $20,000.00. Johnson's valuation based upon 2.50 acres is contrary to the above rule, and the BTA's decision to revert to the Auditor's valuation is not unreasonable or unlawful.

{¶ 49} Since the BTA's valuations of AP1, AP3, and the homesite are not unreasonable or unlawful, Johnson's remaining assigned errors are overruled. The matter is remanded to the BOR to affirmatively demonstrate that its calculation of the CAUV is reliable and supported by the evidence, and if warranted adjust the value accordingly. The decision of the BTA is affirmed in all other respects.

. . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

William S. Johnson
William D. Hoffman
Robert M. Morrow
Jim Williamson, Ohio BTA