[Cite as *State v. Adams*, 2023-Ohio-4691.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 22CA45 |
| | : | |
| MAGGIE ADAMS | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Guernsey County Court
of Common Pleas, Case No.
21CR000396

JUDGMENT:      AFFIRMED

DATE OF JUDGMENT ENTRY:      December 21, 2023

APPEARANCES:

For Plaintiff-Appellee:

JASON R. FARLEY
ASST. PROSECUTOR
GUERNSEY COUNTY
627 Wheeling Ave.
Cambridge, OH 43725

For Defendant-Appellant:

JACOB T. WILL
121 South Main St., Ste. 520
Akron, OH 44308

*Delaney, J.*

{¶1} Appellant Maggie Adams appeals from the October 31, 2022 Judgment Entry of Sentence of the Guernsey County Court of Common Pleas. Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

*Trial evidence*

{¶2} The following evidence is adduced from the record of appellant's jury trial.

{¶3} This case arose around 10:45 p.m. on December 8, 2021, when Detective May and Sergeant Leggett of the Central Ohio Drug Enforcement Task Force were separately monitoring a Speedway gas station in Cambridge, Ohio. The station was located in an area known for drug trafficking and May was undercover, in an unmarked vehicle and plain clothes. May communicated with Leggett by cell phone.

{¶4} May observed a black four-door sedan with West Virginia plates parked at a gas pump. He saw a woman identified as appellant exit the gas station store and get into the car. He then noticed a passenger later identified as Deon Christian in the black car. A silver SUV with North Carolina plates was parked on the other side of the gas-pump island; May suspected the SUV was a rental car due to the age and condition. He called Leggett and advised him to watch the SUV.

{¶5} Leggett was in a marked police cruiser and uniform, accompanied by K-9 Hoke. While May and Leggett spoke, May observed Christian get out of appellant's car and walk quickly to the silver SUV, which then pulled away. May advised Leggett he suspected an illegal narcotics transaction had occurred.

{¶6} Leggett watched the SUV pass him and caught up to it on the northbound ramp to Interstate 77, where the vehicle took off at a high rate of speed. As the vehicle merged onto 77, Christian failed to use a turn signal and sped up. Leggett traveled at speeds in excess of 90 m.p.h. to keep up. He turned on lights and sirens and traffic-stopped Christian, who stopped the SUV in the middle of a lane of traffic.

{¶7} Leggett approached the SUV and spoke to Christian and his passenger, identified as Lee Gray. He first instructed Christian to pull to the side of the highway because of the vehicle's dangerous location. Leggett smelled a strong odor of marijuana emanating from the vehicle and asked for consent to search. Christian agreed, and he and Gray exited the SUV before the search. Both men were patted down and found to have large amounts of currency on their persons; Christian had $2,674 and Gray had $1,457.

{¶8} At that point Leggett advised May to call him immediately, suspecting this was a narcotics delivery and the drugs might be at the Speedway location.

{¶9} In the meantime, Deputy Devon Ryan arrived at the Speedway and assisted May in contacting appellant in the parking lot. May identified himself to appellant, showed her his badge, and asked what brought her to Cambridge. Appellant responded that she was here "to cheat on her husband." May asked her about the man he observed jog from her car to the SUV, and asked whether the two were involved in a drug transaction. Appellant said she understood why he might think that. As May spoke to appellant, Leggett called with news of the currency found on the occupants of the SUV. May asked appellant for consent to search her car and she declined.

{¶10} Leggett returned to the Speedway with K-9 Hoke and performed an open-air sniff around the exterior of appellant's vehicle. Hoke very quickly alerted on the vehicle, indicating an odor of narcotics. Leggett asked appellant why Hoke would alert on her car and appellant responded, "I don't know; I can't say anything because these people will hurt me."

{¶11} May and Leggett commenced a probable-cause search of appellant's vehicle and found a large Ziploc bag of suspected methamphetamine in the center console. They also found additional baggies of suspected methamphetamine, brown powder, two pipes, and white pills in appellant's purse. Another bag containing a brown substance was found in the center console. The suspected narcotics were collected, bagged, photographed, weighed, and taken into evidence to be tested.

{¶12} May returned to speak to appellant in the back of Leggett's patrol car after Mirandizing her. Appellant told May she "never knows" what all the drugs are when she's involved in deliveries. Appellant said someone puts the drugs in her car and she delivers them to a certain address in Parkersburg. Appellant said she was just trying to make a little money and the guy she was meeting is named Chris.

{¶13} Appellant was arrested and transported to the Guernsey County Jail where May and Detective Carpenter interviewed her again. Appellant admitted she came to Cambridge to meet "Chris" and this was not the first time they met; she knew "Chris" through someone named "Q." Appellant was supposed to meet Chris to obtain narcotics, then deliver the narcotics to an address in Parkersburg. She would be paid upon delivery and this wasn't the first time she's made this trip. May asked appellant if she "pinches a little off the top," meaning whether she takes a little of the narcotics for her own personal

use, and she said no. She agreed with May that the amount of narcotics found was not for personal use. In May's estimation, the large amounts would be broken down into smaller amounts for resale.

{¶14} At one point during the jail interview, appellant mentioned a "cartel," which indicated to May that appellant believed the large amount of narcotics might indicate involvement of a cartel organization. Appellant also asked detectives whether she might be able to "help herself out," which they took to mean cooperate and provide information in exchange for a reduced sentence.

{¶15} When asked what happened at the Speedway, appellant said she went into the station, and when she came out Chris was in her car, as witnessed by May. She got back in her car and didn't know where he put the drugs, but he "usually" put them in the console. She admitted she paid Chris for the drugs. She also admitted the methamphetamine in her purse is hers and she uses methamphetamine.

{¶16} The substances found in appellant's car were tested and determined to be 446.4 grams of methamphetamine in the Ziploc bag, and a grand total of 462.71 grams of methamphetamine including the smaller bags in appellant's purse. The other substance found in the console was a combination of two drugs, fentanyl and tramadol, in the amount of 14.141 grams.

{¶17} Appellant was charged by indictment as follows: Count I, aggravated drug trafficking (methamphetamine) pursuant to R.C. 2925.03(A)(2) and (C)(1)(f), a felony of the first degree; Count II, trafficking in a fentanyl-related compound pursuant to R.C. 2925.03(A)(2) and (C)(9)(e), a felony of the second degree; Count III, aggravated possession of drugs (methamphetamine) pursuant to R.C. 2925.11(A) and (C)(1)(e), a

felony of the first degree; and Count IV, possession of drugs pursuant to R.C. 2925.11(A), (C)(10)(a) and (C)(2)(c), a misdemeanor of the first degree (as amended). Counts I and III are accompanied by major-drug-offender specifications pursuant to R.C. 2941.1410(A).

{¶18} Appellant entered pleas of not guilty and filed a motion to suppress evidence arising from her stop and arrest.

*Suppression hearing*

{¶19} The matter proceeded to an evidentiary hearing on October 17, 2022, and the following evidence was adduced at the suppression hearing.

{¶20} On December 8, 2021, around 10:45 p.m., Detective Cory May of the Guernsey County Sheriff's Department was working as a narcotics detective with the Central Ohio Drug Enforcement Task Force on patrol with Sgt. Leggett in the City of Cambridge. May and Leggett communicated with each other via cell phones. May was monitoring a Speedway gas station location known for drug activity; he has responded to overdoses at that location and his training and experience led him to believe it was the scene of drug activity.

{¶21} May noticed two vehicles parked on either side of a pump; one was a black four-door sedan with a West Virginia registrations and the other was a silver SUV with a North Carolina registration. Both vehicles had valid registrations.

{¶22} May was fueling his unmarked vehicle directly behind the sedan, later identified as appellant's car. He observed appellant come out of the gas station and sit in her car for an unusually long period of time, which caught his attention and led him to watch the vehicle. May wondered what appellant was doing because she wasn't getting

fuel and she wasn't leaving. May also noticed the silhouette of someone's head on the passenger side of the vehicle.

{¶23} As May watched, a male exited appellant's car and jogged over to the passenger side of the SUV. May described the person as a middle-aged black male with short hair who appeared to be in a hurry. May advised Leggett that something appeared to be amiss and asked Leggett to watch the SUV after it pulled away from the gas station. Appellant's car remained at the gas station.

{¶24} May then saw appellant exit the gas station again with a coffee cup in her hand and return to her car, although he hadn't seen her re-enter the gas station. May notified a patrol officer, Ptl. Ryan, that something was amiss and he wanted to contact appellant. May believed he had just witnessed a drug transaction.

{¶25} May approached appellant, identified himself, and asked her what she was doing. Appellant replied that she "traveled to the gas station to cheat on her husband." T. 20. While she spoke to May, appellant looked at the ground and wouldn't meet his eye; at one point she requested a cigarette. She appeared to be nervous.

{¶26} In the meantime, May learned Leggett had effectuated a traffic stop on the silver SUV and discovered large amounts of currency on both occupants, increasing the likelihood for May that he witnessed a drug transaction at Speedway. May requested that Leggett come to his location with his K-9 trained in drug detection to perform a sniff around appellant's vehicle. May testified Leggett arrived in about 10 minutes with the K-9.

{¶27} May asked appellant for consent to search her car and she declined. Leggett arrived and conducted an open-air sniff; the dog indicated a positive alert on the driver's side of the vehicle. The officers then conducted a probable-cause search of the

vehicle and recovered a large amount of suspected methamphetamine and fentanyl from the center console.

{¶28} May's conversation with appellant occurred outside the vehicle and she had no passengers at that time. She was not under arrest and made no attempt to walk away from May; she freely answered his questions. May considered appellant to be detained once he learned the SUV was traffic-stopped and a large amount of currency was recovered. May advised appellant of her Miranda rights after the narcotics were found in her vehicle.

{¶29} Upon cross-examination, May was asked what was unusual about appellant's vehicle at the gas station, other than the out-of-state registration. He replied that his attention was caught by the time of night, coupled with being next to a rental car, and that the passenger ran or jogged from her car to the passenger side of the rental SUV and left. May acknowledged he didn't see the black male carrying anything. Nor did he know any of the individuals involved.

{¶30} May reiterated that his conversation with appellant occurred entirely in the parking lot; he approached her, identified himself, and showed her his badge. She freely answered his questions and was free to leave until he was notified the silver SUV had been traffic-stopped.

{¶31} Appellant argued May lacked reasonable suspicion to detain her for the purposes of a Terry stop of her person and lacked reasonable suspicion to extend the detention to bring the K-9 to the scene. Appellee argued that May's initial conversation with appellant was a consensual encounter, the K-9 arrived within a reasonable time frame of a few minutes, and the stop was not unduly prolonged.

{¶32} The trial court ruled from the bench that May's initial contact with appellant was a consensual encounter which grew into an investigatory stop, then a sniff, then a probable-cause search of the vehicle. On October 19, 2022, the trial court issued a Findings of Fact/Conclusions of Law/Judgment Entry overruling appellant's motion to suppress.

*Jury trial, conviction, and sentence*

{¶33} The matter proceeded to trial by jury and appellant was found guilty as charged.

{¶34} A sentencing hearing was held on October 28, 2022. The trial court found that Counts I and III merged for purposes of sentencing, and that Counts II and IV merged. Appellee elected to sentence upon Counts I and II. The trial court imposed a total consecutive aggregate prison term of 18 to 23 and a half years.

{¶35} Appellant now appeals from the judgment entry of her convictions and sentence.

{¶36} Appellant raises two assignments of error:

**ASSIGNMENTS OF ERROR**

{¶37} "I. THE JURY'S FINDING OF GUILT AS TO THE TRAFFICKING CHARGES AND THE ACCOMPANYING SPECIFICATIONS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶38} "II. THE TRIAL COURT ERRED IN DENYING DEFENDANT-APPELLANT'S MOTION TO SUPPRESS."

**ANALYSIS**

I.

{¶39} In her first assignment of error, appellant argues her trafficking convictions in Counts I and II are against the manifest weight of the evidence. We disagree.

{¶40} Appellant was convicted of two counts of drug trafficking pursuant to R.C. 2925.03(A)(2), which states:

> No person shall knowingly do any of the following:
>
> * * * *.
>
> Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

{¶41} Appellant asserts her trafficking convictions are against the manifest weight of the evidence because her vehicle remained stationary throughout the incident and there is no evidence she "set into motion" the steps described in the statute to "prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance." We find appellant's arguments unavailing and contrary to the evidence presented at trial.

{¶42} The controlled substances involved were methamphetamine (Count I) and a fentanyl-related compound (Count II). The methamphetamine in the Ziploc bag pulled from the console of appellant's vehicle weighed 446.4 grams, prompting Leggett to

exclaim "Woo hoo! Oh boy! That's his biggest one!" referring to K-9 Hoke's indication on appellant's vehicle. The total weight of the fentanyl mixture was 14.141 grams. We note the extraordinary weight of the narcotics because appellant's claims of total naivete as to the substances involved and their ultimate purpose are belied by the quantities involved. Appellant is an admitted meth user. When asked by May if she "pinches a little off the top" of her deliveries, she said no and agreed with May that these amounts were much more than for personal use. The jury could reasonably find appellant knew exactly what the narcotics were and knew the end result of her pickup and delivery was drug sales.

{¶43} The evidence established appellant is familiar with the business of drug trafficking. When Hoke indicated on her vehicle, appellant told officers she was scared because the people involved might kill her, she doesn't really know them, and mentioned a "cartel." As the investigation progressed, by the end of the jail interview, appellant asked if she could do something to "help" herself in terms of cooperation, admitted she knew "Chris" for at least a month, and had done this before. She admitted throughout her conversations that "Chris" would place narcotics in her vehicle which she delivered to a residence in Parkersburg, that she did this because she wanted to make a little money, and she would be paid upon delivery. The sequence and timing of events strongly suggest "Chris" deposited narcotics in appellant's vehicle in return for the currency he and his passenger were immediately caught with; in other words, appellant bought the narcotics from "Chris" to deliver to another location in an amount to be broken down and sold. In short, the record is replete with evidence upon which the jury could have based its findings of guilt.

{¶44} Upon a challenge to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Ashcraft*, 5th Dist. Richland No. 2021-CA-0024, 2023-Ohio-2378, ¶ 14, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997). In the instant case, we find no such manifest miscarriage of justice.

{¶45} "Weight of the evidence" addresses the evidence's effect of inducing belief. *State v. Thompkins*, *supra,* 78 Ohio St.3d at 386-387, 678 N.E.2d 541 (1997), *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 83. When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Thompkins* at 387, 678 N.E.2d 541, *citing Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (quotation marks omitted); *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1244, ¶ 25, citing *Thompkins.* The uncontroverted evidence in the instant case established appellant had a prearranged meeting with "Chris," paid him for a large amount of narcotics which he placed inside her vehicle, and which she intended to deliver to Parkersburg, where she would be paid.

{¶46} Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that " 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist.

1983). The Ohio Supreme Court has emphasized: " '[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 334, 972 N.E.2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978).

{¶47} We find that this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the entire record in this matter we find appellant's trafficking convictions are not against the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of appellant's guilt.

{¶48} Appellant's first assignment of error is overruled.

II.

{¶49} In her second assignment of error, appellant argues the trial court should have granted her motion to suppress. We disagree.

{¶50} Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact. *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist.1998). During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility. *State v. Brooks,* 75 Ohio St.3d 148, 154, 661 N.E.2d 1030

(1996). A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Medcalf*, 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist.1996). Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard. *State v. Williams*, 86 Ohio App.3d 37, 42, 619 N.E.2d 1141 (4th Dist.1993), overruled on other grounds.

{¶51} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. First, an appellant may challenge the trial court's finding of fact. In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. See, *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141 (4th Dist.1991). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See*, Williams*, supra. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 96,620 N.E.2d 906 (8th Dist.1994).

{¶52} In the instant case, appellant argues May did not have reasonable suspicion to *Terry* stop her in the Speedway parking lot, and the stop was unreasonably prolonged for Leggett to bring K-9 Hoke to the scene for a sniff.

{¶53} We will first address May's initial encounter with appellant in the gas station parking lot, which appellant seeks to classify as a *Terry* stop. *See*, *State v. Crouse*, 5th Dist. Licking No. 16 CA 37, 2017-Ohio-1097, ¶ 17. Instead, we find May's initial conversation with appellant to have been a consensual encounter.

{¶54} The Fourth Amendment to the United States Constitution and Section 14, Article I, Ohio Constitution, prohibit the government from conducting unreasonable searches and seizures of persons or their property. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991). "However, not every contact between police officer and citizen implicates the Fourth Amendment. 'Only when the officer, by means of physical force or show of authority, has in some way restricted the liberty of a citizen may we conclude that a "seizure" has occurred.' " *State v. Lopez*, 2nd Dist. Greene No. 94 CA 21, 1994 WL 527670, quoting *Terry, supra*, at 19, fn. 16. A *Terry* stop is an investigatory detention, more intrusive than a consensual encounter, but less intrusive than a formal custodial arrest, and such a stop is valid if the officer had a reasonable and articulable suspicion of criminal activity. *See State v. Stonier*, 5th Dist. Stark No. 2012 CA 00179, 2013–Ohio–2188, ¶ 43.

{¶55} Ohio law accordingly recognizes a distinction between a *Terry* stop and a consensual encounter; the latter occurs "* * * when the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away." *State v. Daniels*, 5th Dist. Stark No. 2002CA00290, 2003–Ohio–2492, ¶ 12, quoting *State v. Taylor*, 106 Ohio App.3d 741, 747, 667 N.E.2d 60 (1995). Thus, police officers are permitted to engage in "consensual encounters" with

citizens without running afoul of Fourth Amendment prohibitions on searches and seizures. *See United States v. Hinojosa*, 534 Fed.Appx. 468, 470 (6th Cir. 2013), citing *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *United States v. Waldon,* 206 F.3d 597, 602–03 (6th Cir. 2000). Furthermore, a police officer's request to examine a person's identification does not render an encounter nonconsensual. *See Florida v. Bostick, supra,* citing *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). *Accord State v. Miller,* 5th Dist. Licking No. 01 CA 79, 2002–Ohio–2465. The relevant inquiry is whether a reasonable person would feel free to disregard the officer's request and leave the scene. *See State v. Miller,* 148 Ohio App.3d 103, 107–108, 2002–Ohio–2389, 772 N.E.2d 175.

{¶56} We review the issue of the existence of a consensual encounter by examining the totality of the circumstances. *See Florida v. Royer*, 460 U.S. 491, 506–507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

{¶57} May's initial approach to appellant in the parking lot and their ensuing conversation was entirely voluntary and appellant was free to leave.  May's attention was drawn to appellant's car because it had West Virginia plates, was parked at an island by an apparent rental SUV with North Carolina plates, and was parked at the pump for an unusually long period of time. As May watched the vehicles, Deon Christopher exited appellant's car and "jogged" to the SUV before it pulled away. This occurred at a gas station known for drug activity. The totality of the circumstances led May to question whether he observed a drug transaction and he called Leggett to tell him to watch the SUV. When appellant came out of the gas station for the second time, May wanted to contact her and did so once a uniformed officer was present.  May was in plain clothes.

He approached appellant, identified himself, showed his badge, and asked what brought her to Cambridge.

{¶58} Appellant argues May's approach and the ensuing conversation resulted in an unlawful police detention under the Fourth Amendment. However, we find the initial encounter between appellant and May to be consensual for purposes of the Fourth Amendment because May had no reason or intent to detain appellant at that point. *Crouse*, supra, 5th Dist. Licking No. 16 CA 37, 2017-Ohio-1097, ¶ 21, citing *Brendlin v. California,* 551 U.S. 249, 255, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) (indicating that a seizure occurs "[w]hen the actions of the police *** show an unambiguous intent to restrain"). *See, also, United States v. Hinojosa*, *supra*, at 470 (finding that officers had left the defendant with "a reasonable means of egress such that [he] was physically capable of terminating the encounter and leaving the area at any time.")

{¶59} May's interaction with appellant began as a consensual encounter which then progressed to an investigative or *Terry* stop such that the Fourth Amendment was not implicated. *State v. Shrimplin*, 5th Dist. Coshocton No. 2021CA0006, 2021-Ohio-3720, ¶ 38, citing *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Appellant next argues even if the Court finds the initial "detention" of her was proper and/or that it was a consensual encounter, the subsequent actions of the officers resulted in the incident turning into an improper detainment or custodial arrest prior to the K–9 drug sniff of the vehicle.

{¶60} "An officer may not expand the investigative scope of the detention beyond that which is reasonably necessary to effectuate the purposes of the initial stop unless any new or expanded investigation is supported by a reasonable, articulable suspicion

that some further criminal activity is afoot." *Ashland v. Zehner*, 5th Dist. Ashland No. 2012-CA-25, 2012-Ohio-5545, ¶ 14, citing *State v. Batchili,* 113 Ohio St.3d 403, 2007–Ohio–2204, 865 N.E.2d 1282, ¶ 34; *United States v. Brignoni–Ponce,* 422 U.S. 873, 881–882, 95 S.Ct. 2574, 45 L.Ed.2d 607(1975). "In determining whether a detention is reasonable, the court must look at the totality of the circumstances." *State v. Bobo,* 37 Ohio St.3d 177, 178, 524 N.E.2d 489(1988).

{¶61} As May spoke to appellant, she was visibly nervous and claimed she came to Cambridge to cheat on her husband. May had observed Christopher jog from appellant's vehicle to the SUV. His training and experience, together with the location and the actions he observed in the parking lot, led him to believe a drug transaction occurred between the occupants of the vehicles. As he spoke to appellant, Leggett called to say he traffic-stopped the SUV and found large amounts of currency on the occupants, confirming May's suspicion that a drug transaction took place and the narcotics were likely with appellant. The consensual encounter was thus elevated into a *Terry* stop while May investigated further.

{¶62} "Under *Terry,* police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot * * *." *State v. Swift*, 2nd Dist. Montgomery No. 27036, 2016–Ohio–8191, ¶ 10. May testified that appellant was not free to leave once Leggett advised him of the traffic stop of the SUV. At that point, May had increasing evidence supporting his reasonable, articulable suspicion that he witnessed a drug transaction because the occupants of the SUV were flush with cash.

{¶63} May had reasonable, articulable suspicion to temporarily detain appellant and question her further. In the meantime, he told Leggett to return with Hoke, and Hoke was at Speedway in about 10 minutes. The use of a drug detection dog does not constitute a "search" and an officer is not required, prior to a dog sniff, to establish either probable cause or a reasonable suspicion that drugs are concealed in a vehicle. *State v. Camp*, 5th Dist. No. 14CA42, 2014-Ohio-329, 24 N.E.3d 601, ¶ 30, citing *Illinois v. Caballes,* 543 U.S. 405, 409, 125 S.Ct. 834, 838, 160 L.Ed.2d 842 (2005); *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983); *State v. Carlson,* 102 Ohio App.3d 585, 594, 657 N.E.2d 591 (9th Dist.1995); *United States v. Seals,* 987 F.2d 1102, 1106 (5th Cir.1993). Further, if a trained narcotics dog alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle for contraband. *United States v. Reed,* 141 F.3d 644 (6th Cir.1998) (*quoting United States v. Berry,* 90 F.3d 148, 153 (6th Cir.1996), *cert. denied* 519 U.S. 999, 117 S.Ct. 497, 136 L.Ed.2d 389 (1996)); *accord, United States v. Hill,* 195 F.3d 258, 273 (6th Cir.1999); *United States v. Diaz,* 25 F.3d 392, 394 (6th Cir.1994); *State v. French,* 104 Ohio App.3d 740, 663 N.E.2d 367 (12th Dist.1995), *abrogated on different grounds, City of Dayton v. Erickson,* 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996).

{¶64} May had a reasonable suspicion of illegal drug activity. He could lawfully call for a police dog and wait for it to arrive to check for drugs based on this suspicion. *Camp*, supra, 2014-Ohio-329, ¶ 31. Once Hoke alerted to appellant's car, the officers had probable cause to search that vehicle for contraband. *Id.* No violation of appellant's Fourth Amendment rights has been demonstrated. *Id.*

{¶65} The trial court did not err in overruling appellant's motion to suppress, and the second assignment of error is overruled.

## CONCLUSION

{¶66} Appellant's two assignments of error are overruled and the judgment of the Guernsey County Court of Common Pleas is affirmed.

By: Delaney, J.,

Hoffman, P.J. and

Wise, J., concur.